UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | 24-CR-329 (ARR) |
| -against- | **OPINION AND ORDER** |
| ELIAHOU PALDIEL and CARLOS ARTURO SUAREZ PALACIOS, | |
| *Defendants.* | |

Defendants Eliahou Paldiel and Carlos Arturo Suarez Palacios have been charged with conspiracy commit wire fraud, arising from their involvement in an alleged scheme to defraud Uber, its drivers, and its riders (Count One), and conspiracy to commit money laundering (Count Two). Indictment, ECF No. 1. Mr. Paldiel has moved to dismiss both counts of the Indictment. For the reasons set forth below, I GRANT in PART and DENY in PART Mr. Paldiel's motion as to Count One, and DENY Mr. Paldiel's motion as to Count Two.

## FACTUAL BACKGROUND

### I.    Operation of Uber's Rideshare Services

Among other services, Uber provides ridesharing services through its smartphone application. *Id*. ¶ 3. Rideshare services "connect customers with drivers for on-demand transportation." *Id*. ¶ 4. A customer, or "rider," may order a ride through Uber's smartphone application (the "Uber App") by specifying pick-up and drop-off locations, upon which the Uber App presents the rider with an approximate fare for the prospective trip. *Id*. ¶ 5. If the rider is satisfied with the fare, the rider confirms their request for a ride. *Id*.

After the rider makes a ride request, the Uber App sends that request to a nearby driver using Uber's driver-side application. *Id*. ¶ 6. In the New York area, Uber provides a prospective

1

driver only "limited information about the prospective ride, such as the passenger rating, pick-up location, the general cardinal direction of the passenger's destination, and the 'surge amount,' if any, associated with the ride." *Id*. ¶ 7. Based on the information provided, the prospective driver may choose to accept or decline the requested ride. *Id*. ¶ 6. If the driver rejects the requested ride, the request is offered to another nearby driver until the request is accepted by a driver or the request expires. *Id*. The driver is not given the approximate fare or the user's destination address "until after the driver accepts the ride." *Id*. ¶ 7. In certain areas of concentrated demand, such as airports or event venues, drivers "may be required to 'queue' in order to receive ride requests, which are distributed according to the order in which the drivers arrive in the vicinity" of that area. *Id*. ¶ 9.

Once a driver accepts the requested ride, the driver navigates to the rider's pickup location and transports the rider to their drop-off destination. Typically, the Uber App provides real-time location tracking of the driver, rider, and trip throughout the entirety of the above process. *Id*. ¶ 8. Payment is handled electronically though the Uber App and is not paid directly from the riders to drivers. *Id*.

Uber "calculates ride fares based on a variety of factors including distance, time of day[,] and demand" for rides. *Id*. ¶ 10. "[W]hen demand for . . . rides increase[s] in [a] certain geographic location[], resulting in a shortage of [Uber] drivers available in that area," Uber may increase the fare price charged to riders in that area. *Id*. In turn, a driver who agrees to pick up a rider from a high-demand area, and then provides a ride from that area, is paid an increased amount. *Id*.[1]

---

[1] The Indictment does not specify whether Uber calculates the fare that it will provide to the driver independently from, or as a function of, the price charged to a rider for that ride.

Those increased prices, which Uber refers to as "surge" pricing, are designed to "temper demand and encourage drivers to service high-demand areas." *Id*. Both riders and drivers are typically presented with the surge pricing before confirming their request for a ride or accepting a prospective ride. *Id.* Uber's App permits Uber drivers to see whether a geographic area has surging prices. *Id*. To receive a surge fare, the driver "must be in, or travel to, the particular surge area." *Id*.

## II.    Alleged Offense Conduct

As charged in Count One of the Indictment, Mr. Paldiel and Mr. Palacios, among others, conspired to defraud Uber, its riders, and its drivers by "causing riders to pay millions of dollars in fraudulent 'surge' fees" to drivers participating in defendants' scheme (the "Scheme Drivers") and "depriving legitimate [Uber] drivers of their true share of 'surge' fares and most valuable trips." *Id*. ¶ 12. Specifically, defendants developed their own applications (the "Scheme Apps") that permitted users of those applications to manipulate the Uber App without Uber's knowledge or approval. *Id*. ¶¶ 13, 15.

The "Fake GPS" application enabled Scheme Drivers to manipulate their own locations within the Uber App and make it appear as if they were located in an area with surging fares despite being located elsewhere. *Id*. ¶ 15. In turn, Scheme Drivers "obtain[ed] surge pricing increases on rides to and from locations that were not actually 'surging.'" *Id*. The location manipulation also permitted Scheme Drivers to enter airport and event "queues" in the Uber App prior to arriving at the location, thereby "cutting the line ahead of" drivers not using Fake GPS. *Id*.

The "Screwber" application permitted Scheme Drivers to access information about ride requests, namely the riders' destination and the approximate fare for that ride, that Uber

ordinarily did not provide to prospective drivers. *Id*. By viewing that information, Scheme Drivers were able to accept or decline prospective rides "based on information to which they were otherwise not entitled and, in turn, cherry-pick only the most profitable . . . rides offered to them." *Id*.

Defendants sold the Scheme Apps to "approximately 800" Scheme Drivers. *Id*. ¶ 22. Defendants charged those drivers various one-time installation fees and a $300 monthly subscription. *Id*. ¶ 20. From about December 2019 to September 2023, Mr. Paldiel received approximately $1.5 million from the Scheme Drivers, which were the proceeds of the Scheme Drivers' fraudulent use of defendants' applications. *Id*. ¶ 24. Count Two of the Indictment charges defendants with conspiracy to launder those funds, which are alleged to be the proceeds of wire fraud. *Id*. ¶¶ 25–28, 33.

### III.    Procedural History

On November 27, 2024, Mr. Paldiel filed the instant motion to dismiss the Indictment, Mot. to Dism., ECF No. 36, which the government opposed, Resp. in Opp. ("Opp."), ECF No. 37. Given that, the parties briefing "d[id] not clearly delineate" certain arguments associated with the motion, I ordered the parties to provide further briefing on two questions. Order for Further Briefing, ECF No. 44. First, the government was directed to clarify its theory regarding which victims were affected by defendants' collection of "fraudulent surge fees." *Id*. at 2 (internal quotation marks omitted). Second, the government was directed to further explain its theory that defendants "interfered with and caused de[terioration] to [Uber's] property interest in its algorithms and the operation of [its a]pplication." Opp. at 18. The government addressed those questions shortly after issuance of the order. Response, ECF No. 47.

4

As for the first question, the government responded that it intended to prove that Uber, its drivers, and its riders were all victims of the fraudulent collection of surge fares. The fares were paid to defendants from a bank account "owned and controlled by" Uber that was maintained "for the benefit of drivers." *Id*. at 2. Meanwhile, a Scheme Driver's use of a false location "did not directly affect the fare paid by a rider who was picked up by that driver," as "surge payments by riders and surge payments to drivers are 'decoupled,'" and calculated by Uber using different methodologies. *Id*. Nonetheless, the government asserts that riders were victimized, since other riders picked up by other drivers for different rides "may have paid surge fees they otherwise would not have" because "one potential effect of the scheme was to artificially prolong surge." *Id*.

As for the second question, the government answered that it "does not intend to proceed" on the alternative theory of liability that defendants "interfered with and caused [deterioration] to [Uber's] property interests in its algorithms and the operation of the Rideshare Algorithm." *Id*. (internal quotation marks omitted).

## STANDARD OF REVIEW

Federal Rule of Criminal Procedure 12(b) permits defendants to raise by pretrial motion "any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1); *United States v. Sampson*, 898 F.3d 270, 278–79 (2d Cir. 2018). Thus, Rule 12(b) permits a defendant to challenge an indictment "on the ground that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012).

In deciding a motion to dismiss under Rule 12(b), "a court must accept all factual allegations in the indictment as true, and should not look beyond the face of the indictment and

draw inferences as to proof to be adduced at trial." *United States v. Ramos*, No. 23-CR-554, 2024 WL 4979204, at *2 (S.D.N.Y. Dec. 4, 2024) (internal quotation marks admitted). As relevant here, an indictment must "contain[] the elements of the offense charge and fairly inform[] a defendant of the charge against which he must defend." *United States v. Lee*, 833 F.3d 56, 69 (2d Cir. 2016) (internal quotation marks omitted). However, an indictment generally does not "have to specify evidence or details of how the offense was committed." *United States v. Wey*, No. 15-CR-611, 2017 WL 237651, at *5 (S.D.N.Y. Jan. 18, 2017).

In deciding whether to dismiss a single count that asserts several "independent ground[s] for a conviction," I am permitted to partially dismiss that count as to those grounds that are legally insufficient. *See United States v. Hoskins*, 902 F.3d 69, 76 (2d Cir. 2018) (concluding that the government could appeal a partial dismissal of a single count of an Indictment, where the district court dismissed two "independent grounds for a conviction" but permitted prosecution for that count under the remaining alternative theories, and affirming district court's partial dismissal as to one of those theories). Thus, where a single conspiracy count asserts multiple "objects of the conspiracy," I may narrow the indictment to exclude those objects that fail to state an offense. *Id*. at 73, 98.

**DISCUSSION**

To convict Mr. Paldiel of wire fraud conspiracy, the government must prove that he conspired to engage in (1) a scheme to defraud, (2) with the use of the wires to further the scheme, and (3) that money or property was the object of the scheme." *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021) (internal quotation marks omitted). Thus, the Indictment must properly allege not only that the defendants "engaged in deception, but also that money or property was an object of their fraud." *Ciminelli v. United States*, 598 U.S. 306, 312 (2023).

The Indictment alleges a complex and interlocking theory of fraud in which defendants conspired to defraud three categories of victims of distinct property interests. First, defendants "caus[ed] riders to pay millions of dollars in fraudulent 'surge' fees to" users of defendants' applications. Ind. ¶ 12. Second, defendants "depriv[ed] legitimate [Uber] drivers of their true share of 'surge' fares and most valuable trips." *Id*. Third, defendants defrauded Uber by permitting drivers to "accept or decline the prospective rides based on information to which they were not otherwise entitled" and "interfered with [Uber's] business operations by . . . impairing the effectiveness of its computer algorithms and its ability to effectively pair riders with drivers." *Id*. ¶¶ 15, 19. Each of those victim classes and their associated property interests represents a distinct "object" of, and "independent grounds for a conviction" for, defendants' fraud conspiracy. *Hoskins*, 902 F.3d at 76.

Mr. Paldiel's motion to dismiss contends that none of the Indictment's asserted interests are cognizable as property under the wire fraud statute, or alternatively, that the Indictment fails to allege a scheme to defraud any property interest that has been properly alleged. For the reasons set forth below, I agree with Mr. Paldiel that several of the Indictment's theories of fraud fail to state the charged offense.

## I.      Unearned Surge Fees

### A.      Uber

As alleged, Uber charges increased prices to riders and provides increased fares to drivers for rides in high-demand areas designated by its algorithm. Mr. Paldiel's applications permitted the Scheme Drivers to collect those higher fees from Uber for rides in locations that were not actually subject to surge pricing. Ind. ¶ 15(a) (alleging that the Scheme Drivers "were able to fraudulently obtain surge pricing increases on rides to and from locations that were not actually

'surging'"). Those allegations, if proven, would establish that defendants deprived Uber of a traditional property interest—money that it owned and possessed—in the form of unearned surge prices paid to Scheme Drivers. *See* 18 U.S.C. § 1343 (providing that a scheme to defraud must have as its object "*money* or property" (emphasis added)); *United States v. Chang*, 2024 WL 2817494, at *4 (noting that money is a "traditional property interest.").

In response, Mr. Paldiel lodges two objections, neither of which is availing. First, he contends that it is undisputed that the Scheme Drivers transported "actual customers who were truly and accurately within a 'surge' zone," and that the fees paid by the Scheme Drivers were "identical" to what Uber "would have paid . . . absent Mr. Paldiel's applications." Mot. at 2–3. However, Mr. Paldiel's characterization of the Indictment contradicts its plain language, and it is well-settled that, in deciding a motion to dismiss, the court "must accept the government's factual allegations as true." *Chang*, 2024 WL 2817494, at *3; *see also* Ind. ¶ 12 (alleging that Uber and its riders paid fraudulent surge fees for rides in non-surge zones). Mr. Paldiel's assertion that the Indictment's allegations do not reflect how his scheme operated merely raises challenges to the sufficiency of the government's evidence, which are not appropriately addressed on a pretrial motion to dismiss. *See United States v. Alfonso*, 143 F.3d 772, 776–77 (2d Cir. 1998); *Sampson*, 898 F.3d at 278 (noting that "pretrial factual findings" that "constitute[] a premature adjudication as to the sufficiency of the government's evidence" are "improper at the Rule 12(b) stage").

Second, he cites a series of Second Circuit precedents, discussed in greater detail below, which hold that a scheme to defraud must involve deceit that is "coupled with a contemplated harm to the victim" that "affect[s] the very nature of the bargain itself." *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987). Mr. Paldiel contends that the fraudulent surge fares did not deny

Uber the benefit of its bargain, because the Scheme Drivers indisputably "picked up each rider in the rider's actual location and actually transported them to that rider's intended destination." Rep. at 7. However, the government intends to prove that driver compensation was "de-coupled" from the rider's fare, and that the surge prices paid to drivers were tied to the driver's location in a surge zone. Response at 2. The Scheme Drivers' location in a surge zone was therefore undeniably part of Uber's bargain for paying surge prices to those drivers.

In conclusion, the Indictment's allegations that defendants fraudulently obtained surge fares for rides in non-surging locations sufficiently allege that defendants defrauded Uber of property.

### B.    Riders

The government also asserts that Uber's riders were victims of defendants' collection of unearned surge fees from Uber. However, the government's proposed theory relies on an extraordinarily tenuous chain of logic. A Scheme Driver's manipulation of his GPS location "did not directly affect the fare paid by [the] rider who was picked up by that driver," as rider fares were not directly correlated with driver payments. Response at 2. Thus, riders picked up by Scheme Drivers paid the same price to Uber that they would have absent defendants' applications, and the government does not purport that those riders were victims of the scheme. Instead, the government contends that riders "were also likely harmed" because "one potential effect of the scheme was to artificially prolong surge" prices and thus "certain riders who were picked up by drivers . . . may have paid surge fees they otherwise would not have." *Id*.

Even if the government managed to prove those "potential effect[s]," it is questionable whether the victims were deprived of their money. *Id*. Wire fraud does not require that "the party defrauded and the party injured . . . be one and the same." *United States v. Greenberg*, 835 F.3d

295, 305 (2d Cir. 2016) (holding that a "scheme to defraud [need not] involve the deception of the same person or entity whose money or property is the object of the scheme"). Nonetheless, it is difficult to understand how the riders were injured. "Surge" is not an inherent quality of the ride, but rather a label imposed by Uber which signifies that the ride is subject to an increased price. Moreover, a rider who paid an "artificially prolong[ed] surge" price, Response at 2, knew that Uber would charge her that surge price, and agreed to pay it. Although Uber might not have charged the surge price absent defendants' conduct, that counterfactual does not alter the fact that the rider received exactly what she expected to pay for: a surge-priced ride.

I need not decide whether there was a contemplated injury to the riders, as the government's theory fails for a more fundamental reason. The government concedes that the Scheme Drivers' use of incorrect locations did not affect the prices paid by their passengers, and instead relies upon the scheme's "potential[]" downstream effects on other passengers. Response at 2. However, the victim's asserted property loss "must play more than some bit part in a scheme: It must be an object of the fraud" rather than an "incidental byproduct." *Kelly v. United States*, 590 U.S. 391, 402 (2020). The Scheme Drivers, in collecting fraudulent surge fares from Uber for their own rides, plainly "targeted" Uber's money. *Id*. at 400. But it is equally obvious that the riders' payment of "artificially prolong[ed]" surge fares, Response at 2, was not an "object" of that scheme but rather an "incidental byproduct," *Kelly*, 590 U.S. at 402. It is inconceivable that, in collecting fraudulent surge fees for their own rides, the Scheme Drivers aimed to prolong surge fees *paid to Uber* on an entirely different set of rides, passengers, and drivers. That is especially the case given that the government does not claim that defendants engaged in a concerted effort to prolong surge fares, or even that defendants had any way of

knowing if and when that would occur, and instead asserts only that prolonged surge was a "potential effect" that "may have" occurred. Response at 2.

## II.    Distribution of Surge Fees, Queued Rides, and Profitable Rides

The Indictment also alleges a far more expansive theory of "property." As alleged, defendants' scheme permitted Scheme Drivers to "cherry pick" the most profitable rides, obtain fraudulent surge fares for non-surging rides, and "cut[] the line ahead of legitimately operating drivers" in airport and event queues. Ind. ¶ 15. According to the government, defendants thereby "depriv[ed] legitimate drivers of their proper share of surge fees and queued rides to which they were entitled," and thus had the object of obtaining "money" from those drivers. Opp. at 14. Alternatively, the government asserts that defendants' object was to fraudulently obtain money from Uber, in that defendants obtained fares that Uber would otherwise have offered to legitimate drivers. As explained below, neither of those theories demonstrates a scheme to defraud the asserted victims of a traditional property interest. *See Ciminelli*, 598 U.S. at 309 ("[T]he federal fraud statutes criminalize only schemes to deprive people of traditional property interests.").

### A.    Legitimate Drivers

As for the "legitimate drivers," I agree with Mr. Paldiel that the legitimate drivers could not have been deprived "of their true share of 'surge' fares and most valuable trips," Ind. ¶ 12, because those drivers had no property interest in or entitlement to those fares.[2]

#### 1.    Cherry-Picking and Line-Cutting

---

[2] I reject the government's implication that defendants deprived the legitimate drivers of some inchoate right to a fair ride allocation process. That right, even if it existed, is not a "traditionally recognized property interest." *Ciminelli*, 598 U.S. at 315.

The government does not contest, nor could it, that the legitimate drivers did not own, possess, or have care, custody, or control over the fares obtained by the Scheme Drivers from their "cherry-picking" or "line-cutting" activities. Instead, the government asserts that the legitimate drivers were deprived of the fares that they would have earned had they fulfilled the prospective rides taken by the Scheme Drivers. That theory of property rests on an attenuated chain of events: (1) absent defendants' applications, the Scheme Drivers would have been occupied with less profitable rides and been unable to accept the profitable ride offers; (2) those profitable rides would then have been offered to legitimate drivers; (3) the legitimate drivers would have accepted those rides; and (4) the legitimate drivers would have been paid for those fares.

The government's theory implicitly relies on the well-settled principle that "an enforceable right to payment," such as one "created by contract" or statute, is "property" that may undergird a fraud prosecution. *United States v. Sullivan*, 118 F.4th 170, 209 (2d Cir. 2024). However, that principle is inapplicable here, as the legitimate drivers did not have any rights relating to the money at issue. To be property, such right to payment must be "an entitlement to collect money" that is "legally due." *Pasquantino v. United States*, 544 U.S. 349, 355–56 (2005) ("Canada's right to uncollected excise taxes ... is 'property' in its hands," because "[t]his right is an entitlement to collect money from petitioners" and "[v]aluable entitlements like these are 'property' as that term ordinarily is employed."). As the government surely knows, parties competing to obtain contracts have no free-standing legal right to obtain a "fair share," or even *a* share, of available contracts. Nor has any court concluded that all competitors for a fraudulently awarded contract are "class victims" deprived of that contract.

Likewise, nothing in the Indictment alleges that Uber drivers in particular were owed a fair share of surge, profitable, or queued fares, such that the legitimate drivers were deprived of "money to which [they] w[ere] entitled by law." *United States v. Bengis*, 631 F.3d 33, 40 (2d Cir. 2011) (internal quotation marks omitted). Instead, the government asserts that the legitimate drivers were entitled to those fares "under [Uber's] Terms of Service" or because they "properly enter[ed] the queue at the queue location." Opp. at 14. But the Indictment does not allege that Uber's Terms of Service guaranteed a "fair share" of profitable rides to drivers, or indeed, that Uber made any promises whatsoever about the distribution of rides that it would offer to drivers. Nor is that a reasonable inference from the Indictment. The government's secondary argument— that the drivers were entitled to queue fares because they properly joined the queue—is unavailing. Joining a line does not create a legal entitlement to whatever awaits at the end of that line. Thus, while perhaps impolite, cutting a line does not fraudulently deprive other line members of property.

Even if I were to accept the dubious assumption that Uber made certain promises to its drivers, the Indictment would still fail to allege that the legitimate drivers were deprived of "property." Opp. at 14. Under Uber's algorithm, each ride request is "*offered*" to one driver, and if declined by that driver, successively offered to one other driver until "the ride is accepted or expires." Ind. ¶ 6 (emphasis added). Thus, contrary to the government's assertions, defendants did not deprive legitimate drivers of their "proper share" of profitable and queued rides. Opp. at 14. All that those drivers were deprived of is the expectation that they would receive ride *offers*, which if accepted and performed, would create the right to payment of money. "[A]n offer to participate in [a] transaction—one that a potential [offeree] may or may not accept," is not itself "a historically recognized form of property interest." *United States v. Abdelaziz*, 68 F.4th 1, 36

13

(1st Cir. 2023). Nor does an offer to contract for money, much less an offer that was not even *received* by the legitimate drivers and only available to them in theory, create a legal right relating to the money that would have been awarded under the completed contract.

### 2.    Fair Share of Surge Fees

For similar reasons, I also reject the government's theory that the Legitimate Drivers "were victims of the defendants' scheme" to fraudulently obtain surge fares through incorrect reporting of their locations. Response at 1–2. The government "expects to establish that the fraudulently obtained surge payments were paid to the [Scheme Drivers] from . . . accounts owned and controlled by [Uber], maintained by Citibank, for the benefit of drivers (the Citibank Account[s])." *Id*. According to the government, the legitimate drivers were therefore "beneficiaries of the account[s]" and "had a property interest in the money fraudulently obtained by" the Scheme Drivers. *Id*. at 2.

The government's assertions are meritless. The government does not assert or allege that Uber's drivers had an enforceable right, contractual or otherwise, in the payments made from the Citibank Accounts to the Scheme Drivers. Instead, the government apparently asserts that Uber's drivers, as a collective whole, possessed a property interest in the entirety of the funds held in the Citibank Accounts, such that any payment improperly made from those accounts deprived the drivers of their interest in the funds by depleting the amount available. However, Uber's unilateral decision to maintain accounts to pay its drivers did not create such an interest in the Citibank Account funds. Employees and independent contractors do not have any property interest in their employer's money simply because they expect to perform work for their employer in the future and their employer has earmarked funds to pay for that as-yet unperformed work. *See United States v. Rankin*, 651 F. Supp. 3d 523, 569 (D. Conn. 2023)

(noting that "[e]xpectancy is the bare hope of succession to the property of another," and that such an expectancy "has no attribute of property" as "the interest to which it relates is at the time nonexistent and may never exist"); *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980) (noting that "a mere unilateral expectation or an abstract need is not a property interest"). Accordingly, the Legitimate Drivers' expectation of future earnings that would be paid from money held in the Citibank Accounts does not provide them with a property interest in that money.

Insofar as Uber's drivers possessed a cognizable property interest in Uber's money, that right was limited to each driver's *individual* "enforceable right to payment," namely, the right to compensation for rides that they had *already* fulfilled. *Sullivan*, 118 F.4th at 209. However, the fact that Uber paid Scheme Drivers and Legitimate Drivers from the same bank account(s) does not mean that the Legitimate Drivers had a property interest in both their own fares and the Scheme Drivers' fares.[3] The Legitimate Drivers' "property interest" in Uber's money was limited to each driver's "respective portions of the fund"—their own earnings. *Beckwith*, 449 U.S. at 161. The Indictment fails to allege that defendants "wrongfully thwarted" those "enforceable rights to payment," *Sullivan*, 118 F.4th at 209, or "deprive[d the Legitimate Drivers] of money legally due," *Pasquantino*, 544 U.S. at 356. The government does not contend that the payments collected by Scheme Drivers prevented the Legitimate Drivers from collecting their own earnings. Indeed, Uber provided the Legitimate Drivers with ride offers at prices set by its algorithm, and then fully paid those prices once those offers had been accepted and fulfilled. Accordingly, the Legitimate Drivers received all of the money that was "legally due" to them. *Id.*

---

[3] I fail to understand why the government has offered that argument, given that I could find no precedent in support of that conclusion.

Although not clearly articulated, the government apparently assumes that the Legitimate Drivers had a property interest in the fraudulent surge fees because Uber "redistribut[ed] the amount of surge . . . across the driver population," Response at 2, n.1, and therefore the payment of fraudulent surge fees decreased the amount of legitimate surge fees available. However, the legitimate drivers did not possess an "enforceable right to payment" or an "entitlement to collect" the fraudulent surge fares simply because Uber would otherwise have contracted to pay higher surge fares to Legitimate Drivers. *Sullivan*, 118 F.4th at 209 (internal quotation marks omitted). The Legitimate Drivers' "enforceable rights to payment" are limited to the terms of the contracts for their rides, and the government cannot expand the Legitimate Drivers' "contractual rights to payment" to encompass larger payments not provided for by those contracts. *Sullivan*, 118 F.4th at 209. In other words, the government must rely on a property interest or right to payment that actually exists, and cannot instead assert a theoretical right to additional payment under hypothetical contract terms reached in a world without defendants' applications. Thus, even if it were absolutely certain that Uber would have provided more favorable contract terms and paid higher surge fares to Legitimate Drivers, the Legitimate Drivers are not "legally due" those terms or entitled to those additional payments. *Pasquantino*, 544 U.S. at 356.

### 3.    Conclusion

In conclusion, the government has failed to allege that Uber's "Legitimate Drivers" were victims of defendants' scheme to defraud. The government makes much of the notion that defendants' scheme was unfair to Legitimate Drivers, as it "pick[ed] . . . winners and losers" and provided the Scheme Drivers with a competitive advantage in the rideshare marketplace. Opp. at 18. That is likely true, and if the mail and wire fraud statutes encompassed all kinds of harm to

business, the government would be on solid footing. But they do not; "[t]hey bar only schemes for obtaining property." *Kelly*, 590 U.S. at 404.

The government has failed to identify any property interest held by the Legitimate Drivers, and the government cannot bridge that gap by alleging that those drivers were owed, as a matter of fairness, their true share of fares. The fares "lost" by the Legitimate Drivers were either payment for work that had not even been offered to them or hypothetical earnings that contradict the terms of the rides that they had accepted, and the drivers had no entitlement to or property interest in that money. That result is due not to defendants' conduct, but to Uber's creation of an opaque marketplace that provides its drivers with few entitlements or protections.

**B.    Uber**

The Indictment further alleges that Uber was defrauded of money due to the Scheme Drivers' "cherry-picking" of the best rides and "line-cutting" in event and airport queues. As to those fares, the government does not contest that the Scheme Drivers fulfilled the requested rides, at Uber's stated prices uninfluenced by any manipulation, to and from the properly designated locations. Instead, the government contends that Uber was defrauded of its money because Uber would have preferred to pay the same price for the same ride to another driver who had not violated its Terms of Service by using defendants' applications, and who therefore (a) was unaware of the terms of the offered ride before accepting it or (b) had not cut the airport and event queues.

Mr. Paldiel concedes that the money obtained due to those aspects of their applications is property under the wire fraud statutes, and instead contends that defendants lacked the requisite fraudulent intent. *See Starr*, 816 F.2d at 98 ("[A] scheme to defraud [requires] proof that defendants possessed a fraudulent intent."). Although "the government is not required to prove

17

actual injury, it must, at a minimum, prove that defendants *contemplated* some actual harm or injury to their victims." *Id*. (emphasis in original). Thus, misrepresentations that are "only collateral to the sale and d[o] not concern the quality or nature of the goods being sold," such that "there was no discrepancy between benefits reasonably anticipated and actual benefits received" by the purported victim, are insufficient to support a mail or wire fraud. *Id*. At most, such misrepresentations show only "an intent to deceive and to induce the customers to enter into the transaction." *Id*. The Second Circuit's cases have therefore "drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statues—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes." *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) (reversing conviction and dismissing indictment); *see also United States v. Guertin*, 67 F.4th 445, 452 (D.C. Cir. 2023) (dismissing indictment for failure to allege "a scheme to deprive the [employer victim] of 'money or property,'" as defendant's lies about his suitability for his security clearance, without more, failed to plausibly allege that his employer was denied "the benefit of the core employment bargain" in paying his salary).

In *Starr*, the defendants shipped bulk mailings on behalf of their customers through the United States Postal Service, while purporting to those customers that some of those packages had been sent as high-rate mail. *Starr*, 816 F.2d at 95–96. However, the defendants in fact had hidden those packages along with their low-rate mail packages, paid the low-rate price for the entire shipment after charging customers the high-rate price, and pocketed the difference. *Id*. at 96. The court found that the above evidence did not establish a scheme to defraud the customers, as the customers "received exactly what they paid for"— "timely shipment and handling of bulk

mail" —that was "in fact mail[ed] . . . promptly as promised and . . . [to] the correct destination." *Id*. at 99.

In *Shellef*, the Indictment alleged that defendants "promis[ed] to export all of the [chemical] purchased," thereby "induc[ing the manufacturer] to sell additional amounts of [the chemical] . . . that it would not have sold had it know that [defendant] in fact intended to sell the product domestically." 507 F.3d at 109 (quotation marks omitted). The court reversed the fraud conviction and concluded that the indictment was legally insufficient, as the latter failed to allege "a discrepancy between benefits reasonably anticipated and actual benefits received" or that defendant had "misrepresented the nature of the bargain." *Id*. (quotation marks omitted).

The Indictment is insufficient under those cases, as it fails to allege that the Scheme Drivers misrepresented any "essential element" of their bargains with Uber. *Id*.[4] Uber's bargain with its drivers was to deliver an accepted ride, at the price and pickup/dropoff locations unilaterally set by Uber. Under both of the government's theories, the Scheme Drivers delivered precisely what was requested.

As for the government's "cherry-picking" theory, the Indictment does not allege that the Scheme Drivers influenced the price or locations of Uber's offered rides, or even that they influenced which rides would be offered. Instead, the Scheme Drivers simply declined rides, based on the prices and locations set by Uber, until Uber offered a ride with acceptable terms. Ind. ¶ 15(b). Thus, Uber "received exactly what [it] paid for," *Starr*, 816 F.2d at 99, a ride to and from the locations and for the price that it had unilaterally set.

---

[4] I reject Mr. Paldiel's suggestion to consider the implications of the Supreme Court's grant of certorari in *Kousisis v. United States*, 144 S. Ct. 2655 (2024). My duty is to apply the law as it currently stands, rather than to attempt to predict the Supreme Court's views on the matter. Mr. Paldiel is, of course, free to renew his arguments should *Kousisis* dictate a different result.

The Scheme Driver's selective acceptance of more profitable rides is therefore insufficient to support fraud, as it rests on the untenable premise that "an essential element of [Uber's] bargain" for accepted rides was the drivers' lack of knowledge as to their compensation and service to be rendered. *Shellef*, 507 F.3d at 108. However, under New York law, "[b]efore an offer can be accepted, its terms must be definite and certain." *In re Maxwell Commc'n Corp.*, 198 B.R. 63, 67 (S.D.N.Y. 1996) (citation omitted). "As price is an essential ingredient of every contract for the rendering of services, an agreement must be definite as to compensation," without which the contract is merely an unenforceable "agreement to agree." *Cooper Square Realty, Inc. v. A.R.S. Management, Ltd.*, 581 N.Y.S.2d 50, 51 (1st Dep't 1992). Thus, the government cannot argue that an "essential element" of Uber's bargain with its drivers was that those drivers remained unaware as to their compensation (fare) or service to be rendered (the dropoff location). There was no bargain between Uber and a Scheme Driver for a ride *until* the driver accepted, and was thus aware of, those terms of the bargain.

The above reasoning remains relevant even assuming that New York law, or state law generally, is not directly applicable to the present question. In each instance in which Uber paid a Scheme Driver for a cherry-picked ride: Uber offered that driver a ride request at Uber's chosen price; the bargain was struck when the Scheme Driver accepted that offer; and the Scheme Driver gave that ride for that price. What Uber bargained for was the specific ride that had been accepted, and there is no "discrepancy between benefits reasonably anticipated and actual benefits received" for that ride based on whether the driver knew that ride's terms. *Shellef*, 507 F.3d at 109. In either case, the driver takes the same rider, to and from the same place, for the same price. Uber would have received an identical ride from a "legitimate driver" not using defendants' applications. I therefore see little difference between the present case and *Starr*;

20

Uber paid for the "timely shipment and handling of [passengers]" —that were "in fact [transported] . . . promptly as promised and . . . [to] the correct destination." *Starr*, 816 F.2d at 99.

At bottom, the only contemplated harm to Uber that I can remotely attribute to the government's "cherry-picking" theory is that the Scheme Drivers, absent their knowledge of the terms of Uber's ride offers, would have been left to accept additional, less-favorable ride offers. That is insufficient. The foundation of Uber's relationship with its non-employee drivers is that the drivers remain free "to either accept or decline [a] prospective ride," Ind. ¶ 6, and the Indictment does not allege that Uber paid its drivers for or otherwise had any entitlement to their services to fulfill a rejected offer. Thus, the rejected ride offers did not deprive Uber of any property interest or contain any "misrepresentations as to the nature of the bargain," as Uber lacked any bargain with the Scheme Drivers for the rejected rides. *Shellef*, 507 F.3d at 109. Moreover, the government cannot transmute the rejected ride offers into harms attributable to the accepted ride offers, as the ride offers rejected by the Scheme Drivers were separate transactions from, and thus collateral to, the ride offers accepted by the Scheme Drivers. "[T]he deceit practiced must be related to the contemplated harm, and that harm must . . . *reside in the bargain sought to be struck*." *United States v. Schwartz*, 924 F.2d 410, 420 (2d Cir. 1991) (emphasis added); *see also United States v. Porat*, 76 F.4th 213, 228 (3d Cir. 2023) (Kraus, J., concurring) ("[T]he defendant's misrepresentations must relate to the transaction that the government alleges was fraudulent, not some earlier transaction that 'opened the door' for a later, legitimate exchange.").

The government's "line-cutting" theory is deficient for similar reasons. As alleged in the Indictment, Uber required drivers to "queue in order to receive prospective rides" from

passengers in airports and large events, which were "distributed in the order in which the drivers arrived in the vicinity" of such an area. Ind. ¶ 9. Defendants' applications permitted Scheme Drivers to appear as if they had arrived in the area prior to their actual arrival, "thereby reducing the time that the driver had to wait in the queue" to receive a ride offer *Id.* ¶ 15. The Indictment does not allege, however, that any rider was forced to wait longer for a ride due to the Scheme Drivers' line-cutting, such that the Scheme Drivers delivered a lesser service than advertised. Moreover, the indictment does not allege that Uber compensated its drivers, directly or indirectly, for their time spent in the queue. For example, the Indictment does not suggest that Uber offered a higher fare to drivers based on the length of their time in the queue, or that queued rides were subject to different pricing mechanisms than non-queued rides.

Thus, the time spent in the queue was not "an essential element of the bargain" for the rides offered to and accepted by the Scheme Drivers, such that the drivers' misrepresentations about their place in the queue denied Uber a "benefit[] reasonably anticipated" from its bargains for those rides. *Shellef*, F.3d at 109. Once a driver reached the end of the queue, Uber distributed a ride offer. As alleged, Uber would have made an identical offer to any driver with that position in the queue, regardless of whether that driver was (A) a Scheme Driver who had cut the line; (B) a legitimate driver who, by happenstance, had joined a shorter line, or (C) a legitimate driver who had waited in a lengthy line. Given the government's apparent concession that the Scheme Drivers, after accepting a ride at the end of a queue, fulfilled that ride and provided the same service that would have been provided by any other driver, the government's "line-cutting" theory fails to allege a valid wire fraud. The Scheme Drivers' misrepresentation that they had properly waited in line to receive that ride offer was "collateral" to the bargain, *Starr*, 816 F.2d at 99, as the drivers' adherence to the queue and wait times were not part of the performance of the

ride requested to be delivered. As a result, Uber "received exactly what [it] paid for," *id.*, the fulfillment of an accepted offer for a ride.

Finally, I reject the government's argument that the Scheme Drivers' breach of Uber's Terms of Service is sufficient to allege that Uber was defrauded of money. "A breach of contract, without more, does not amount to actionable wire fraud." *Haymount Urgent Care PC v. GoFund Advance, LLC*, 690 F. Supp. 3d 167, 179 (S.D.N.Y. 2023) (quotation marks omitted). Any contemplated harm due to the Scheme Drivers' breach of Uber's Terms of Service is identical to those that I have already found insufficient above.

## III. Confidential Information and Interference with Uber's Algorithm

Finally, the Indictment alleges that defendants, by permitting Scheme Drivers to access otherwise hidden data regarding the fare and destination of a prospective ride, defrauded Uber of two "property" interests: (1) its confidential "propriety [sic] information" and (2) the "effectiveness of its computer algorithms" and "the operation of the Rideshare Application." Opp. at 18. The government asserts that those interests "could independently provide a basis for liability." Opp. at 17. I disagree.

### A. Confidential Information

As the Supreme Court has recently explained, "mere information," even where that information is "valuable" and "economic," is not a property interest protected by the federal fraud statutes. *Ciminelli v. United States*, 598 U.S. 306, 315 (2023). However, the Supreme Court has also concluded that "confidential business information" is intangible property "protected by the mail and wire fraud statutes." *Carpenter v. United States*, 484 U.S. 19, 25 (1987). Although the government asserts that Uber's hidden fare and ride information falls within *Carpenter*, the Indictment's allegations fail to support that proposition.

23

*Carpenter* involved an employee's unauthorized distribution of a news agency's news matter, to which the agency "had a property right in keeping confidential and making exclusive use." *Id*. at 26. Every case applying *Carpenter* has likewise applied it to misuse of confidential information by insiders or employees who owed some duty to the business. *See*, *e.g.*, *United States v. Mahaffy*, 693 F.3d 113, 135 n.14 (2d Cir. 2012) (noting that "*Carpenter* requires proof that the information was both considered and treated by an employer in a way that maintained the employer's exclusive right to the information."); *United States v. Johnson*, No. 16-CR-457, 2017 WL 5125770, at *3 (E.D.N.Y. Sept. 21, 2017) (noting that, under the misappropriation theory of wire fraud, a "defendant may be held liable for fraud when, *acting in violation of a fiduciary or fiduciary-like duty* . . . , he or she uses [an]other person's confidential business information for the defendant's own personal benefit."). Indeed, the Second Circuit has held that a business's property interest in its confidential business information does not extend to third parties who lack any duty to the business. *See United States v. Chestman*, 947 F.2d 551, 571 (2d Cir. 1991) (holding that, while "a scheme to misappropriate material nonpublic information in breach of a fiduciary duty of confidentiality may indeed constitute a fraudulent scheme sufficient to sustain a mail fraud conviction," the ethical obligation owed by husband to his corporate-insider wife "was too ethereal to be protected by either the securities or mail fraud statutes").

By contrast, the Indictment contains no allegations that defendants or the Scheme Drivers held a fiduciary or employment relationship with Uber. Indeed, in other cases, Uber has repeatedly insisted that its drivers are classified as independent contractors. *See*, *e.g.*, *Phillips v. Uber Techs., Inc.*, No. 16-CV-295, 2017 WL 2782036, at *4 (S.D.N.Y. June 14, 2017). Nor can defendants be characterized as "temporary insiders" who were "given access to company information that they agree[d] not to disclose." *United States v. Chow*, 993 F.3d 125, 138 (2d

24

Cir. 2021). Thus, *Carpenter* and its associated cases are inapposite, as the Indictment alleges no basis to infer that Uber's drivers owed Uber a duty to maintain the confidentiality of its business information.

That limitation is important, and its apparent absence from the scheme alleged here underscores the incoherence of the government's position. Under the ordinary "misappropriation" theory, the deceptive device is the "undisclosed, self-serving use of a principal's information . . . in breach of a duty of loyalty and confidentiality," and the property right at issue is the victim's "exclusive use of that information." *United States v. Chow*, 993 F.3d 125, 137 (2d Cir. 2021) (citation omitted). The "theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information." *Id.* (internal quotation marks and citation omitted). By contrast, the Indictment here alleges that Defendants' "scheme or artifice to defraud," 18 U.S.C. § 1343, was their use of the hidden information to "cherry-pick" the best rides, Ind. ¶ 15. At the same time, the Indictment alleges that the object of that fraud was to deprive Uber of exclusivity over the hidden information. Thus, the government's theory rests on a tautology: defendants used Uber's confidential information to deceive Uber with the object of depriving Uber of exclusivity over that information. I fail to understand how the goal of the fraud—the property that defendants aimed to obtain or deprive—was also the deceptive device used to attain that goal.

More importantly, even if *Carpenter* extends to cases in which the person committing fraud lacked any duty to its victim, the information alleged here is entirely unlike the confidential business information that courts have found to be property for purposes of wire fraud. As discussed above, the Indictment alleges that defendants permitted Scheme Drivers, after having received an offer from Uber for a prospective ride, to obtain information about that ride in

making their decision to accept or decline the offer. Ind. ¶ 15(b). Thus, the government's theory

rests on the argument that Uber had a property interest in "keeping confidential" and "making

exclusive use" of the terms of its offers—the price to be paid (the fare) and consideration to be

performed in return (the destination)—against the drivers to whom it made those offers.

*Carpenter*, 484 U.S. at 26. However, the government cites no precedent, nor am I aware of any,

for the proposition that an offeror has a property interest in excluding an offeree from

information regarding the essential terms of its offer. Likewise, I am unaware of any precedent

which would make it a fraud for an offeree to uncover the terms of a non-negotiable offer and

then base her acceptance on those terms, no matter how dishonestly that information was

obtained.[5]

 Indeed, the general rule is the opposite. An enforceable agreement requires "an offer,

acceptance of the offer, [and] . . . . agreement on all essential terms," *Vinifera Imports Ltd. v.*

*Societa Agricola Castello Romitorio SRL*, No. 16-CV-103, 2020 WL 1184962, at *4 (E.D.N.Y.

Mar. 12, 2020) (applying New York law), and therefore the making of an offer, by necessity,

cedes exclusivity or confidentiality over that offer's terms as to the offeree. Thus, whether

labeled as "confidential business information" or otherwise, the terms of Uber's offers to drivers

are not property as traditionally understood, even assuming that the drivers were not "entitled" to

the information and that Uber kept it hidden, Ind. ¶ 15.

 In conclusion, the Indictment fails to allege that defendants' object was Uber's

confidential business information. At most, all that defendants deprived Uber of was "the

---

[5] My conclusion might perhaps be different if the allegedly fraudulent party had obtained
confidential information and used it to craft their offer or counteroffer, but that is not the
situation here. As alleged in the Indictment, Uber made its offers to drivers on a take-it-or-leave-
it basis, with no option but to accept or decline. *Id.* ¶¶ 6–7.

ethereal right to accurate information," namely that the Scheme Drivers were unaware of the fare and destination before accepting an offered ride from Uber, which is not a property interest. *Abdelaziz*, 68 F.4th at 37 (quotation marks omitted).

### B. Algorithms

Finally, without further elaboration or citation to authority, the government contends that defendants' applications provided an independent basis for liability because they "interfered with and caused de[]terioration to" Uber's "property interest in its algorithms and the operation of the Rideshare Application." Opp. at 18. The government has since explained that it does not intend to proceed on that theory of "property." *See* Response at 2, ECF No. 47. In line with that concession, the government will not be permitted to argue before the jury that a "negative[] impact" to Uber's application or business operations constitutes a property interest under the wire fraud statute. *Id*.[6]

## IV. Money Laundering

Finally, Mr. Paldiel argues for dismissal of Count Two of the Indictment, which charges him with conspiracy to commit money-laundering.

A money laundering conspiracy requires proof of two elements: (1) "two or more people agree[d] to violate the federal money laundering statute[s]," and (2) "the defendant knowingly engaged in the conspiracy with the specific intent to commit the offenses that [are] the objects of the conspiracy." *United States v. Garcia*, 587 F.3d 509, 515 (2d Cir. 2009) (internal quotation marks omitted). The money laundering conspiracy charged in Count Two of the Indictment is alleged to have three objects: (1) promotion of specified unlawful activity, in violation of 18

---

[6] I note that this concession does not "limit the evidence" that the government may introduce at trial for an alternative purpose. *Id*. at 2–3.

U.S.C. § 1956(a)(1)(A)(i); (2) concealment of the proceeds of specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and (3) engagement in a monetary transaction derived from specified unlawful activity, in violation of 18 U.S.C. § 1957(a). Ind. ¶ 33.

To prove a substantive violation of any of those three forms of money laundering (promotion, concealment, and engagement), the government would be required to prove that defendants engaged in a "transaction[] involving proceeds of 'specified unlawful activity.'" *United States v. Thiam*, 934 F.3d 89, 92 (2d Cir. 2019) (citation omitted). However, Mr. Paldiel need not have himself committed the underlying "specified unlawful activity." *United States v. Silver*, 948 F.3d 538, 576 (2d Cir. 2020). All that is required is that *someone* "committed all elements of the underlying offense" and that Mr. Paldiel agreed to transact in its proceeds. *Id.* Moreover, because Mr. Paldiel is charged with conspiracy, the government does not need to prove that the transaction occurred. *See Garcia*, 587 F.3d at 515 (noting that an overt act is not an element of money laundering conspiracy).

Mr. Paldiel's first argument, that the Indictment fails to allege a specified unlawful activity, is easily dismissed. As Mr. Paldiel acknowledges, the indictment alleges that he transacted in the "proceeds of . . . wire fraud," Ind. ¶ 33, and substantive wire fraud is a "specified unlawful activity." U.S.C. § 1956(c)(7). As discussed above, the Indictment alleges a set of wire frauds—the Scheme Driver's collection of fraudulent surge fees from Uber.

Mr. Paldiel's second argument, that the Indictment fails to allege that he participated in transactions involving "the direct 'proceeds' of such a fraud," is likewise meritless. Mot. to Dism. at 10. The money laundering statutes clearly define "proceeds" to include "*any* property derived from or obtained or retained, directly or *indirectly*, through" specified unlawful activity. 18 U.S.C. § 1956(c)(9) (emphases added). Thus, even if the fraudulent surge fees were obtained

by the Scheme Drivers and not directly paid from Uber to Mr. Paldiel, Mr. Paldiel's receipt from the Scheme Drivers of money derived from those fees, as payment for his applications, are "proceeds."

Nonetheless, the government's haphazard approach raises troubling evidentiary questions. Although such questions do not warrant dismissal of the Indictment, I briefly note them here. *Sampson*, 898 F.3d at 278 (noting that a premature adjudication as to the sufficiency of the government's evidence" is "improper at the Rule 12(b) stage"). As a preliminary matter, the Indictment alleges that Scheme Drivers equipped with defendants' applications received "fares of over . . . $40,000,000 in rides with [Uber's] customers." Ind. ¶ 33. That sum assumes that the entirety of the Scheme Drivers' fares were proceeds of wire fraud, and contains fares for "fraudulent surge," "line-cutting," and "cherry-picking" rides along with fares for rides in which the Scheme Drivers may not have used defendants' applications. But as discussed above, only the fraudulent surge rides amount to wire fraud, and the wire fraud proceeds in this case are therefore limited to the proceeds of those rides. The other fares might be criminal for another reason but were not produced by a specified unlawful activity.

Standing alone, the admixture of funds may have little practical impact. Although the government must "link the moneys in question to specified unlawful activities," *United States v. Davis*, 122 F.4th 71, 76 (2d Cir. 2024), it "is not required to trace criminal funds that are comingled with legitimate funds," *Silver*, 864 F.3d at 115; *see also United States v. Habhab*, 132 F.3d 410, 414 (8th Cir. 1997) ("The government need not trace the laundered funds to a particular instance of fraud[,]" and "only part of the money involved in the transaction need be derived from the specified unlawful activity."). Presumably, Uber paid drivers in lump sums for

multiple rides. If so, the government is not required to distinguish the fraudulent surge fares from the other fares received by the Scheme Drivers.

However, the Indictment contains a second wrinkle that complicates the question. Mr. Paldiel never received any money directly from Uber. Instead, defendants allegedly conspired to launder money obtained from the Scheme Drivers in exchange for the sale of defendants' applications to those drivers. Ind. ¶ 23 (alleging that defendants "shared profits obtained through the scheme, including, for example, from the monthly subscription fee charged to [Scheme Drivers]"). Between December 2019 and September 2023, defendants received $1.5 million from Scheme Drivers from two kinds of payments: (1) up-front installation fees of approximately $650 and (2) monthly subscription fees of $300. *Id.* ¶ 20. However, the installation fees cannot be "proceeds" at all, as "funds become proceeds when they are 'derived from an already completed offense, or a completed phase of an ongoing offense.'" *United States v. Szur*, 289 F.3d 200, 213 (2d Cir. 2002) (citation omitted). In order to obtain fraudulent surge fees, the Scheme Drivers first had to obtain defendant's applications, and therefore payments made to purchase the applications could not have involved money tainted by wire fraud. *See United States v. Allen,* 76 F.3d 1348, 1361 (5th Cir. 1996) (noting that "[a] fraudulent scheme produces proceeds . . . when the scheme succeeds in disgorging the funds from the victim and placing them into the control of the perpetrators"); *see United States v. Morelli*, 169 F.3d 798, 805–09 (3d Cir.1999) (concluding that funds were the proceeds of fraud when removed from the victims and placed in perpetrators' control). That itself may not prevent criminal liability. The Indictment alleges that the "proceeds" included the monthly subscription fees, and so long as those fees were tainted by fraudulent surge fees, the government does not have to distinguish comingled installation fees from subscription fees due to the lack of a strict tracing requirement.

30

Still, the considerations above combine to further complicate the government's case. To convict defendants, the government must prove that defendants agreed to perform a transaction that involved, or at least that they believed involved, money (1) tainted by one or more subscription fees (2) which were in turn tainted by one or more fraudulent surge fares. *See United States v. Hassan*, 578 F.3d 108, 127 (2d Cir. 2008) (noting that substantive money laundering, "in stark contrast to [money laundering] conspiracy," requires proof "that the funds he laundered were in fact the proceeds of [specified unlawful activity]," and concluding there was sufficient evidence to support conspiracy conviction because defendant "believed that the funds related to cathinone trafficking," even if there was no evidence that he had "actually trafficked in cathinone during th[at] period"); *but see Aronshtein v. United States*, No. 21-518, 2023 WL 2770145, at *1 (2d Cir. Apr. 4, 2023) (noting that money laundering conspiracy requires proof that "proceeds of the specified unlawful activity were realized and acquired before some further financial transaction involving the proceeds took place" (internal quotation marks omitted)).

However, those evidentiary questions cannot be resolved here. Whether the government can prove those facts is distinct from whether those facts would state an offense. I therefore DENY Mr. Paldiel's motion to dismiss Count Two.

## CONCLUSION

In sum, the government has presented a wide-ranging set of theories in support of Count One of the Indictment. As I have explained above, many of those theories are legally insufficient to support a wire fraud conspiracy conviction, as they fail to allege either a traditional property interest as the object of the scheme or a contemplated harm to that interest. I therefore dismiss in part Count One of the Indictment, insofar as it is premised on the following theories:

31

- Defendants schemed to "depriv[e] legitimate . . . drivers of their true share of 'surge' [and queued] fares and most valuable trips," Ind. ¶¶ 12, 15(a).
- Defendants schemed to defraud Uber of money by (a) "cherry-picking" the best ride offers based on the terms of those offers or (b) "cutting the line" in airport and event queues.
- Defendants schemed to defraud Uber of its confidential business information.
- Defendants schemed to defraud Uber of its "property interests in its algorithms and the operation of the [Uber] Rideshare Application." Opp. at 18.

That winnowing leaves Count One of the Indictment, charging wire fraud conspiracy, with one victim and one property interest: a scheme to deprive Uber of money in the form of fraudulently obtained surge fares.


SO ORDERED.


_____/s/_____
Allyne R. Ross
United States District Judge


Dated:            February 18, 2025
                  Brooklyn, New York